IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **Thomas L. Goodman,** </br> **Petitioner,** | ) </br> ) </br> ) |
| v. | )    No. 1:24-cv-944 (PTG/IDD) |
| | ) |
| **Commonwealth of Virginia,** </br> **Respondent.** | ) </br> ) </br> ) |

### MEMORANDUM OPINION

Thomas L. Goodman, ("Petitioner" or "Mr. Goodman"), a Virginia inmate proceeding *pro se*, filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, attacking his November 4, 1985 convictions for robbery, sodomy, rape, and abduction. Dkt. 1. On October 8, 2024, Respondent Chadwick Doston ("Respondent") filed a Rule 5 Answer and a Motion to Dismiss, with a supporting brief and exhibits. Dkts. 16–18. Mr. Goodman filed a response entitled "Affidavit In Support of Brief in Opposition." Dkt. 21. On February 13, 2025, in accordance with *Milla v. Brown*, 109 F.4th 222 (4th Cir. 2024), the Court advised Petitioner of his right to file responsive materials pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). Dkt. 22. On March 6, 2025, Mr. Goodman moved the Court for an extension of time. Dkt. 24. On March 12, 2025, the Court granted Mr. Goodman's motion for an extension making his response due on or before April 11, 2025. Dkt 25.

On April 2, 2025, Mr. Goodman filed a Motion to Dismiss his § 2254 petition without prejudice (Dkt. 26); a Motion to Withdraw his motion to dismiss his § 2254 petition without prejudice (Dkt. 27); and a Notice of Appeal (Dkt. 28).[1] On June 23, 2025, the Fourth Circuit

---

[1] Mr. Goodman's Motion to Withdraw his motion to dismiss without prejudice (Dkt. 27) will be granted, and his Motion to Dismiss without prejudice (Dkt. 26) is dismissed without prejudice. In addition, Chadwick Dotson's Motion to Substitute him as the proper party respondent in this habeas corpus matter (Dkt. 11 at 1 n.1) is granted.

dismissed the appeal for lack of jurisdiction because the order he sought to appeal was "neither a final order nor an appealable interlocutory or collateral order." Dkt. 33 at 2. On July 15, 2025, the Fourth Circuit issued its mandate restoring this Court's jurisdiction. Dkt. 37. On July 22, 2025, Mr. Goodman filed a "response to the court's order," with an attachment. Dkts. 38, 38-1. Accordingly, this matter is now ripe for disposition. For the reasons that follow, Respondent's Motion to Dismiss must be granted, and the petition will be dismissed with prejudice.

**I. Procedural History**

*A. Trial Proceedings*

On June 28, 1985, at approximately 9:50 a.m., Detective Patterson, Hampton City Police Department, submitted four warrants to the magistrate charging Mr. Goodman with the June 28, 1985 robbery, sodomy, rape, and abduction of Eula Robinson. Dkt. 18-1 at 8–15. After the preliminary hearing on July 18, 1985, the general district court found probable cause and certified all four charges to the grand jury. *Id.* On August 5, 1985, a grand jury sitting in the Circuit Court of the City of Hampton indicted Mr. Goodman for the June 28, 1985 robbery, sodomy, rape, and abduction of Eula Robinson. Dkt. 18-1 at 19–26. On October 4, 1985, Mr. Goodman appeared with counsel, pleaded not guilty, waived his right to a jury trial, and the court found him guilty of all four offenses. *Id.* at 34–38. On November 4, 1985, Mr. Goodman was sentenced to ten years in prison for robbery, in violation of Virginia Code § 18.2–58; ten years in prison for sodomy, in violation of Virginia Code § 18.2–67.1; thirty years in prison for rape, in violation of Virginia Code § 18.2–61; and twenty years in prison for abduction, in violation of Virginia Code § 18.2–47 and § 18.2–48. *Id.* at 59–66.

At trial, Eula Robinson ("Robinson") testified that on June 28, 1985, she was at the West End Market, her family's convenience store, in the Queen Anne Plaza in Hampton, Virginia. Trial

Transcript ("Tr.") at 9–10. The West End Market had two restrooms. *Id.* at 10. The first bathroom had a sign, "Out of Order," on the door; even though it was not out of order, it was only for family members. *Id.* at 10–11, 83–84. The other bathroom was marked with a sign, "Gentleman." *Id.* at 10. There were four people in the store that morning—three were regular customers, and the fourth was a young black male ("young male"), about eighteen, wearing a red jacket and khaki pants. *Id.* at 11–12.

Two of the customers left. *Id.* at 12. As the third customer was leaving the West End Market, the young male, who was looking at an earring display, asked if Robinson had any "clip-on earrings," "the price of [a] drink," and "to see the sunglasses." *Id.* As Robinson moved back down the counter to the cash register, the young male came at her with a broken bottle, grabbed her, and then directed her to open the cash register. *Id.* at 13. Robinson complied and he took two ten dollar bills, a few one dollar bills, and then asked Robinson if the store had a back room. *Id.* Robinson led him to the bathroom with the "Out of Order" sign and the two entered. *Id.* Once inside, the young male told her to take off her clothes and lie on the floor. *Id.* The young male then said, "I don't have much dick," and he entered Robinson's vagina, "a little bit." *Id.*[2] The young male acted mad and then bit Robinson's left breast, which left it swollen and red. *Id.*.

The young male then took the broken bottle and, without touching her, moved the bottle "slowly down [her] body." *Id.* He put the bottle down, reached up to the sink, and made Robinson spread her "legs out," and then picked up the bottle. *Id.* at 14. Robinson told him that there was

---

[2] On cross-examination, when asked about her testimony at the preliminary hearing that the young male had "pushed at her vagina two or three times," Robinson acknowledged the prosecutor had explained "the importance of penetration," and that the young male did not "have an erection." *Id.* at 24. She then denied that it would be more accurate to say that he had only pushed at her vagina but had "not actually entered it." *Id.* On re-direct, Robinson testified and reaffirmed her testimony from the preliminary hearing that the young male had "pushed two or three times, and he penetrated me. And he did push hard." *Id.* at 28.

3

more money "under the counter," and he responded by turning her over and sticking "his finger up [her] vagina." *Id.* Next, the young male told Robinson to stand up, and she again mentioned the money under the counter. *Id.* He told Robinson to kiss him, she gave him a "peck," and then he told her to get dressed and warned her that if she said "anything," that she would "be first one [he] came after. Remember I have a gun in the car." *Id.* Robinson did not consent to any of the conduct in the bathroom. *Id.* at 18.

The two returned to the counter and the young male asked for a "a pack of Newport cigarettes." *Id.* at 14. Robinson complied and reached under the counter for "a bundle of fifty ones," and gave the bundle to the young male. *Id.* As she reached under the counter, Robinson activated the alarm system that called the police. *Id.* 14–15. The young male then left the store.[3] *Id.* at 16.

On June 28, 1985, at about 8:00 a.m., Officer Bernice Patricia Orr received an alert for the armed robbery at the West End Market, which described the suspect as "a black male, with khaki pants . . . red shiny jacket and old shoes." *Id.* at 43–44. Orr observed a black male wearing khaki pants and a yellow shirt, about two to three blocks from the Queen Anne Plaza. *Id.* at 43–44, 46. As she exited her cruiser, the black male, Mr. Goodman, reached for a bulge in his back pocket. *Id.* at 44. Officer Orr patted him down for her safety and before she told him why she had stopped him, Mr. Goodman stated that, "she ran back and threw the money at me, and [then] ran back in the store." *Id.* At that time, Orr did not know "what was taken" during the robbery. *Id.* at 45. Orr

---

[3] Robinson admitted at trial that she could not identify Mr. Goodman as the young man who had robbed and assaulted her, even when the police brought him back by the store after he was in custody. *Id.* at 23. At that time, Mr. Goodman was standing and was not wearing the red jacket and when asked to identify him, Robinson said she was "not sure." *Id.* at 19, 23. Robinson explained that she "thought [her] life was at stake," and had "tried not to look at him in the eye." *Id.* at 23.

4

arrested Mr. Goodman about 8:20 a.m. and read him his rights. *Id.* Orr identified Mr. Goodman as the same man that she had arrested on June 28, 1985. *Id.* While another officer questioned Mr. Goodman, Mr. Goodman made a statement about "a lady." *Id.* Someone asked Mr. Goodman what lady and Mr. Goodman responded by stating "over there," and nodded "over to the West End Market." *Id.* at 50.

During her direct testimony, Robinson identified two earrings that were missing after the young male left as the type that were on her display by the cash register. *Id.* 17. The two earrings she identified as missing had been recovered from Mr. Goodman's front pocket when he was searched after he was arrested. *Id.* at 53. Police also recovered a red jacket during their search of Mr. Goodman's person. *Id.* at 50. The red jacket had been "stuck down . . . along the front parts of [Mr. Goodman's] pants." *Id.* at 50, 51. The red jacket was admitted into evidence and Robinson identified it as the red jacket that her assailant had worn. *Id.* at 18.

Detective John Patterson advised Mr. Goodman of his rights and then interviewed him about what had happened. *Id.* at 55–56. Mr. Goodman admitted to playing video games in the laundromat and then going to the store next door where he asked for a job application. *Id.* at 56. He was told that there were no applications available, paid for a sandwich, and then left. *Id.* at 56–57. Mr. Goodman stated he walked back and forth in front of the store. *Id.* at 57. While he was walking, the lady opened the door and threw money at him. *Id.* Mr. Goodman "picked up what [he] could," and then "ran back the way" he came. *Id.* He stopped running because he was "hot," took off his jacket, and "wrapped it around [his] waist." *Id.* "[T]hat's when the lady cop drove up, . . . put [him] in the car and read [him his] rights," and took him back to the West End Market. *Id.* During his statement, Mr. Goodman told Detective Patterson that he paid for the sandwich

5

with a ten dollar bill and that the lady gave him eight dollars and some change. *Id.* at 58. Mr. Goodman denied attacking or raping the lady in the bathroom. *Id.* at 58–59.

Multiple witnesses identified Mr. Goodman at trial. Christine Bailey identified Mr. Goodman as having been in the laundromat next door to the West End Market, at about 8:00 a.m. on June 28, 1985, and testified that he was wearing a red jacket. *Id.* at 30–33. Dwight Wendel Roach also identified Mr. Goodman as the man he had seen playing a video game inside the laundromat at about 8:00 a.m. on June 28, 1985. *Id.* 39–40. Roach also saw Mr. Goodman leave the laundromat. *Id.* at 40. Roach testified that, a few minutes later, he saw a man run past the laundromat in the direction of Queen Street, but he could not say if the man was Mr. Goodman. *Id.* at 40–41.

### B. Appellate Proceedings.

Mr. Goodman, by counsel, appealed his convictions to the Virginia Court of Appeals alleging the evidence was insufficient to support his conviction for abduction. Dkt. 18-1 at 70. The court refused his petition on October 2, 1986, and denied his petition for rehearing on December 5, 1986. *Id.* at 74–75. Mr. Goodman, by counsel, filed a petition for appeal in the Virginia Supreme Court, which was refused on March 17, 1987. *Id.* at 73, 79.

### II. Federal Petition

On May 13, 2024, Mr. Goodman executed his federal habeas petition, pursuant to 28 U.S.C. § 2254, and raised the following grounds:

> Ground 1: "Factual Innocence, [due] to the fact that" the victim "never charged" him. Mr. Goodman "was arrested without the complaining witness" ever "charging" him "per criminal complaint." In a sexual assault case, "the victim is the only one that can be the complaining witness," which is "proof of factual innocence." Dkt. 1 at 5.
>
> Ground 2: "Void Warrant of Arrest–Felony–rape & sodomy [due] to the victim not taking out a criminal complaint charging [Mr. Goodman] with rape or sodomy." Mr. Goodman "was unlawfully seized in violation of the U.S.

6

        Const. 4th Amendment because [he] was never lawfully accused, nor was [he] lawfully charged for committing the above criminal offenses," in violation of his Fourth Amendment right against unreasonable seizures. *Id.* at 7.

Ground 3: "Jurisdictional Defect: [Due] to Magistrate ignoring mandatory requirement of a statute." The "Magistrate issued the four arrest warrants based upon the sworn statements of Detective Patterson, and ignored the mandatory requirement which stated the following: The warrant shall require the officer to whom it is directed to summon such witnesses as shall therein be named to appear and give evidence on the examination. Thus, in those cases in which mandatory requirement of a statute have been ignored, the jurisdiction of the court is thereby defeated." *Id.* at 8.

Ground 4: "Involuntary Servitude: Due to [Mr. Goodman's]wrongful judgment of conviction." The victim "failed to take out charges against [Mr. Goodman] for the criminal offenses of rape and sodomy." Mr. Goodman "was not duly convicted . . . because the victim never charged [him] with the crime of rape nor sodomy; all in violation of the 13th Amendment." *Id.* at 10.[5]

## III. Statute of Limitations

Under the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), a petition for a writ of habeas corpus must be dismissed if filed later than one year after (1) the judgment becomes final; (2) any state-created impediment to filing a petition is removed; (3) the United States Supreme Court recognizes the constitutional right asserted; or (4) the factual predicate of the claim could have been discovered with due diligence. 28 U.S.C. § 2244(d)(1)(A)–(D). To be properly filed, the petition must be delivered in compliance with the applicable laws and rules governing filings, including format and time requirements. *Artuz v. Bennett*, 531 U.S. 4, 8 (2000). The United States Supreme Court has emphasized that an untimely state petition is not properly filed. *Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005).

---

[5] Mr. Goodman admits in his petition that other than the direct appeal, he has not "filed any other motions, petitions, or applications concerning this judgment of conviction in any court." Dkt. 1 at 4. He also admits that he has not raised any of his federal claims on direct appeal or in any post-conviction motion, petition or application. *Id.* at 4–10.

7

AEDPA was not enacted until 1996, eleven years after Mr. Goodman's 1985 convictions. *See Brown v. Angelone*, 150 F.3d 370, 371 (4th Cir. 1998). "[A] prisoner whose statutory right to seek federal habeas relief accrued prior to the AEDPA must receive a reasonable period of time after the statute's effective date to file his petition." *Id.* at 374. The Fourth Circuit held that "a 'reasonable period' means one year from the effective date of the AEDPA—*i.e.*, that prisoners whose convictions became final any time prior to the effective date of the AEDPA had until April 23, 1997, to file their § 2254 petition or § 2255 motion." *Id.* at 375. Mr. Goodman executed his federal habeas petition on May 13, 2024, over twenty-five years after April 23, 1997. Dkt. 1 at 14. Therefore, absent statutory or equitable tolling, his petition is barred as untimely.

*A. Statutory Tolling*

Under AEDPA, a state prisoner must file his petition for a writ of habeas corpus within one year of the completion of the state court direct review process. 28 U.S.C. § 2244(d)(1)(A). In calculating the one-year period, the Court must exclude the time during which any properly filed state collateral proceeding pursued by Mr. Goodman's was pending. *See* 28 U.S.C. § 2244(d)(2); *see also Pace*, 544 U.S. at 417 (determining that the definition of "properly filed" state collateral proceedings, as required by § 2244(d)(2), is based on the applicable state law as interpreted by state courts). Mr. Goodman admits he has not filed any state collateral petitions or motions. Dkt. 1 at 4. He is, therefore, not entitled to statutory tolling.

*B. Equitable Tolling*

A petitioner "seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way. *Pace*, 544 U.S. at 418. Indeed, equitable tolling is available only in "rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to

enforce the limitation period against the party and gross injustice would result." *Green v. Johnson*, 515 F.3d 290, 304 (4th Cir. 2008).

A petitioner generally is obliged to specify the steps taken in pursuing his federal claim to demonstrate his diligence. *Spencer v. Sutton*, 239 F.3d 626, 630 (4th Cir. 2001). In addition, the petitioner must "demonstrate a causal relationship between the extraordinary circumstance on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the circumstances." *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000). "[T]he second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control." *Menominee Indian Tribe v. United States*, 577 U.S. 250, 257 (2016).

Here, Mr. Goodman has not expressly sought equitable tolling, and the record before the Court does not warrant a finding that equitable tolling is applicable to this habeas petition. Mr. Goodman has, however, alleged that he is "factually innocent." Dkt. 1 at 4. The Supreme Court held in *McQuiggin v. Perkins* that a convincing claim "of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." 569 U.S. 383, 392 (2013). The exception applies only in a "severely confined category"—that is, in a case in which reliable new evidence shows that "it is more likely than not that 'no reasonable juror' would have convicted" the petitioner had the evidence been available at trial. *Id.* at 395; *see Royal v. Taylor*, 188 F.3d 239, 243–44 (4th Cir. 1999) (to support a claim of "actual innocence," a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence") (citation omitted); *see also Bousley v. United States*, 523 U.S. 614, 623 (1998) ("It is important to note in this regard that 'actual

9

innocence' means factual innocence, not mere legal insufficiency."). A gateway claim of actual innocence, requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.*

Mr. Goodman does not rely on any new evidence to establish a claim of actual innocence. Instead, he presents a claim of "legal innocence," based upon alleged errors by the state magistrate when he issued the warrants for Mr. Goodman's arrest. Dkt. 21 at 4. He alleges the magistrate violated a state statute when he relied on Detective Patterson's statements as his basis for finding probable cause and issuing the warrants—*i.e.*, hearsay—which Mr. Goodman argues is not admissible to support a finding of probable cause. *Id.* Mr. Goodman asserts that only the victim, Eula Robinson, could provide the probable cause for a warrant. *Id.* He argues the alleged violations resulted in the general district court loosing "statutory jurisdiction," that those errors prevented the circuit court from acquiring subject matter jurisdiction, and that his convictions are therefore void. *Id.* at 3, 5–7. This is an assertion of legal innocence, which is insufficient to state a claim of actual innocence. Moreover, for the following reasons, Mr. Goodman's argument has no merit.

First, probable cause for the issuance of a warrant can be based upon hearsay evidence. *See Franks v. Delaware*, 438 U.S. 154, 165 (1978) ("[P]robable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily."); *United States v. Castillo*, 866 F.2d 1071, 1077 (9th Cir. 1988) ("A magistrate may consider hearsay statements in an affidavit in determining whether there is probable cause to believe that a person is guilty of a crime.").

10

Second, Mr. Goodman's convictions resulted from the indictments returned by the grand jury, not the warrants issued by the magistrate. Dkt. 18-1 at 19–26. In Virginia, an indictment is valid if it is returned by the grand jury and the name of the witness who provided testimony to the grand jury is included at the foot of the indictment. *See* Va. Code Ann. § 19.2-202. Mr. Goodman's indictments were returned as "True Bills," signed by the foreperson, returned by the Clerk, and the name of witness, Detective J. Patterson, is affixed at the foot of each indictment as the witness. Dkt. 18-1 at 19–26. The indictments complied with Virginia Code § 19.2-202.

Additionally, the Fourth Circuit has previously rejected a habeas petitioner's assertion that a state court lacked jurisdiction to convict the petitioner, finding that the issue of jurisdiction was one of state law. *Wright v. Angelone*, 151 F.3d 151, 158 (4th Cir. 1998) (first citing *U.S. ex rel. Roche v. Scully*, 739 F.2d 739, 741 (2d Cir. 1984) then citing *Wills v. Egeler*, 532 F.2d 1058, 1059 (6th Cir. 1976)). *Wills* held that a "determination of whether a state court is vested with jurisdiction under state law is a function of the state courts, not the federal judiciary." 532 F.2d at 1059. The *Roche* court noted that "no federal court to our knowledge has ever granted a writ where a state court's asserted lack of jurisdiction resulted solely from the provisions of state law." 739 F.2d at 741. In accord with *Wright* and the authorities upon which it relied, the determination of a state court's jurisdiction involves a matter of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Similarly, claims based on alleged defects in state grand jury proceedings, which determine if probable cause exists to charge a defendant with having committed a crime, are not reviewable in federal habeas unless they present an independent federal constitutional claim. *See Lopez v. Riley*, 865 F.2d 30, 32–33 (2d Cir. 1989); *cf. Wainwright v. Goode*, 464 U.S. 78, 83 (1983) ("It is

11

axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."). Since the Fifth Amendment's requirement of indictment by a grand jury does not apply to the states, any possible irregularity or defect would involve an error of state law.[7] *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972) (noting that the "grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment") (citation omitted),

Finally, any irregularity or defect in the warrants issued against Mr. Goodman was cured by his convictions. *United States v. Mechanik*, 475 U.S. 66, 73 (1986) (noting the "jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation"); *United States v. Masiarczyk*, 1 F. App'x 199, 213 (4th Cir. 2001) (concluding that "even if [the agent's] grand jury testimony was inaccurate or false, that falsity provides no basis for reversing [the defendants'] convictions" and holding that "because the petit jury subsequently convicted [the defendants] beyond a reasonable doubt, any error in their grand jury proceedings is harmless").

Mr. Goodman also alleges the prosecution suppressed his "Prior Forensic Science Evidence DNA test results that exclude me from being the suspect in my prior rape and sodomy cases." Dkt. 6 at 5. In support of that assertion, Mr. Goodman attached an October 1, 1985 Certificate of Analysis ("COA") issued by the then Bureau of Forensic Science to his petition and a Request for Laboratory Examination ("Request") submitted by Detective Patterson dated July 3,

---

[7] The Due Process Clause guarantees a defendant "the 'right to reasonable notice of a charge against him, and an opportunity to be heard [in] his defense . . . .'" *Barbe v. McBride*, 477 F. App'x 49, 51 (4th Cir. 2012) (quoting *In re Oliver*, 333 U.S. 257, 273 (1948)). Mr. Goodman neither alleges that he lacked the required notice nor that there was no probable cause to indict him.

12

1985. Dkts. 2, 7. The Request indicated the victim "was raped and sodomized," requested "serology;" and included six items:

| | |
|---|---|
| #1 | a bag containing clothing; |
| #2 | "sealed brown env[elope]–victim PERK (check for seme and foreign hairs); |
| #3 | a bag "containing victim blouse (check for foreign hair and fibers. Compare with #4); |
| #4 | a "sealed brown env[elope]–suspect PERK (compare with # 1,2,3,)." |
| #5 | a "sealed blood vial with suspect whole blood." |
| #6 | a "sealed brown paper bag containing suspect underpants. (check for foreign hair and body fluids. Compare with #1 and #2). |

Dkt. 7 at 1. The documents that Mr. Goodman attached to his § 2254 petition and submitted with a subsequent pleading are not the results of DNA testing, which did not begin in Virginia until 1989.[8] The record of the criminal proceeding establishes that Mr. Goodman knew of DNA testing well before he filed the present § 2254. Therefore, Mr. Goodman has not been diligent in bringing his petition. *See Pace*, 544 U.S. at 418.

Subsequent to his conviction and the refusal of his appeals, Mr. Goodman filed motions and requests in the circuit court. In these pleadings before the state circuit court, he mentioned "test result on rape" several times. On April 17, 1998, Mr. Goodman executed and then filed a "Motion for Trial Transcript" which, in pertinent part, alleged that his "due process rights were violated . . . in that . . . *The test result on rape were negative* yet, I was found guilty. . . ." Dkt. 18-1 at 86–88 (emphasis added). The trial judge denied his request for a free transcript on April 28,

---

[8] The Virginia Department of Forensic Science did not begin DNA testing until 1989. *See* Michelle, Hibbert, *State and Federal DNA Database Laws Examined*, FRONTLINE https://www.pbs.org/wgbh/pages/frontline/shows/case/revolution/databases.html (last viewed Aug. 1, 2025). The Virginia Supreme Court did not find DNA testing was admissible until 1989. *See Spencer v. Commonwealth*, 384 S.E.2d 775, 783 (Va. 1989). The Virginia General Assembly subsequently enacted a statute allowing for the admissibility of DNA testing in 1990. Va. Code Ann. § 19.2-270.5 (1990 Va. Acts c. 669) (enacted April 9, 1990).

1998. *Id.* at 85. On March 11, 2003, Mr. Goodman filed a "Motion for Production of Documents" and in his motion stated that his trial counsel had "recently turned over [Mr. Goodman's] files *all besides the results on the rape test performed* on [Mr. Goodman and] Mrs. Robinson, the alleged victim." *Id.* at 90 (emphasis added). In a motion dated April 8, 2003, Mr. Goodman again sought production of his transcript, documents from the police, and "the rape test results." *Id.* at 92. Additionally, a letter dated June 22, 2010 from the institutional attorney at Red Onion State Prison states that Mr. Goodman intended to file a writ of actual innocence and inquires on Mr. Goodman's behalf "if a Certificate of Analysis dated October 1, 1985 is in Mr. Goodman's court file." *Id.* at 95.

Finally, in a letter from Mr. Goodman dated March 11, 2011, Mr. Goodman sought copies of several "legal court documents" that had been "destroyed" by another inmate on October 6, 2010. *Id.* at 98. Among the documents he requested was the "Certificate of Analysis of the P.E.R.K. test results." *Id.* The record reflects that Mr. Robinson has known, for over a decade, that the tests performed in 1985 were "negative," that those results were reflected in a COA dated October 1, 1985, and that the COA contained the "P.E.R.K. test results." The claims in Mr. Goodman's petition were available to him since his convictions in 1985, and his "cause" has been known to him since at least 1998.[9] Accordingly, Mr. Goodman has not been diligent with regard

---

[9] "[E]ven in situations in which equitable tolling initially applies, a party must file suit within a reasonable period of time after realizing that such a suit has become necessary." *Walker v. Frank*, 56 F. App'x 577, 582 (3d Cir. 2003). "A grant of equitable tolling, unlike statutory tolling, does not shift the deadline so that each day of tolling results in a one-day postponement of the deadline." *Ragan v. Horn*, 598 F. Supp. 2d 677, 680 (E.D. Pa. 2009) (citing *Phillips v. Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993)), *rev'd on other grounds*, 411 F. App'x 491 (3d Cir. 2011). Once the extraordinary circumstance justifying equitable tolling has ended, the petitioner must file as soon as reasonably possible. *Id.*; *see also Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Med. Sch.*, 167 F.3d 1170, 1175 (7th Cir. 1999) (noting that tolling does not provide "an automatic extension of indefinite duration" and the plaintiff must file within a reasonable period of time).

to this alleged "cause" by which he seeks to excuse his untimely § 2254 petition. *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (noting that to toll statute of limitations for habeas petitioners must "show that extraordinary circumstances prevented him from filing his petition on time," and that he "acted with reasonable diligence throughout the period he seeks to toll").

Further, the only basis for Mr. Goodman's statement in his April 1998 motion—that the "test result on rape were negative"—would have come from his counsel because the Request and the COA are not in the state court criminal record. Dkt. 18-1 at 86–88. Mr. Goodman does not explain how he acquired either document. However, the record before the Court indicates that Mr. Goodman's only source of documents related to his case, that could have contained both the Request and the COA, was his counsel's file, which he admits he received in 2003, eleven years before he filed his § 2254 petition. *Id.* at 90. Accordingly, Mr. Goodman's federal petition is untimely and will be dismissed as untimely.

### IV. Certificate of Appealability

According to Rule 11(a) of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." R. 11(a), Rules Governing Section 2254 Cases U.S. District Courts; *see also* 28 U.S.C. § 2253(c)(1)(A) (prohibiting an appeal to the respective court of appeals from a final order concerning a habeas corpus petition "[u]nless a circuit justice or judge issues a certificate of appealability"). A certificate of appealability ("COA") will not issue absent "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve

encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

Where a district court dismisses a petition solely based on procedural grounds, and does not address the underlying constitutional claims, *Slack* instructs the court to issue a COA only when the petitioner demonstrates that "jurists of reason" would find both the petition's "claim of the denial of a constitutional right" and the district court's dispositive procedural ruling "debatable." *Id.* at 484. As to whether the procedural ruling is "debatable," *Slack* further advises that when the procedural bar present is "plain" and "the district court is correct to invoke it to dispose of the case," "jurists of reason" could not find "that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id.*

Here, the petition will be dismissed because Mr. Goodman failed to file his federal petition for a writ of habeas corpus within a reasonable time after the enactment of the one-year statute of limitations permitted under 28 U.S.C. § 2244(d)(1). *See, supra* at 8. Where such "a plain procedural bar is present," this Court finds that "jurists of reason" would not and could not "find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Thus, this Court will not issue a COA to Mr. Goodman.

Mr. Goodman may, however, seek a COA from the United States Court of Appeals for the Fourth Circuit. Where a district court denies a COA, the petitioner "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." R. 11(a), Rules Governing Section 2254 Cases U.S. District Courts.

## V. Conclusion

For the foregoing reasons, Respondent's Motion to Dismiss, Dkt. 17, will be granted, and an appropriate Order and judgment shall be issued.

Entered this 13th day of August, 2025.
Alexandria, Virginia

/s/
Patricia Tolliver Giles
United States District Judge